IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**SAMANTHA VANTERPOOL,**

        **Plaintiff,**

v.                                                                    C.A. No.:  3:13CV513

**KENNETH T. CUCCINELLI, II,**
        **IN HIS INDIVIDUAL CAPACITY**

**AND**

**CHARLES E. JAMES, JR.,**
        **IN HIS INDIVIDUAL CAPACITY**

        **Defendants.**

**REBUTTAL BRIEF IN SUPPORT
OF RESPONDENTS' MOTION TO DISMISS**

        Kenneth T. Cuccinelli, II and Charles E. James, Jr. (collectively, referred to herein as "Respondents"), by counsel, hereby submit this Rebuttal Brief in Support of their Motion to Dismiss Plaintiff's Amended Complaint.

**A.**    **Vanterpool's Alleged Speech Was Not A Matter Of Public Concern.  Therefore, It Is Not Protected Under The First Amendment.**

        Vanterpool contends that her alleged speech constituted a matter of public concern.  In doing so, Vanterpool makes no effort to distinguish the Supreme Court's decision in *Garcetti* and its progeny.  Rather, she baldy contends that her comments were a matter of public concern, relying primarily on (i) her contention that the speech concerned a political fight between two

1

GOP candidates vying for the gubernatorial nomination, and (ii) a November 1, 2013 article in the Virginian-Pilot which discussed Cuccinelli's travel schedule during the campaign.[1]

Vanterpool's contention fails to recognize that "a matter of public concern" is a legal phrase with legal meaning. It does not include all speech that arguably results in public interest. For example, in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Supreme Court found that an employee's memo, which addressed Los Angeles County Police Department's serious misrepresentations used to obtain search warrants, would certainly trigger public interest. However, the Court ruled that it was not a matter of public concern.

In this case, the content, form and context of Ms. Vanterpool's comments also show that they are not matters of public concern. Rather, these comments are clearly written from the perspective of a government employee within the Office of the Attorney General and reflect directly on the policies of the Office. They are not written as a private citizen. Ms. Vanterpool clearly expressed her disagreement with office policies and operations. Such conduct is not protected by the First Amendment. This Court has noted, "[e]xpressing disagreement with policy choices and with the operations of . . . staff is not speech that touches upon a matter of public concern and thus, is not constitutionally protected." *Merritt v. Mullen*, 49 F. Supp. 2d 846, 850 (E.D. Va. 1999).

This is consistent with other cases where the first amendment has been held not to protect public employees who "spoke out" concerning office policies. *See Connick v. Myers*, 461 U.S. 138, 148-49 (1983) (the transfer policies and morale problems of a district attorney's office); *Terrell v. Univ. of Texas Sys. Police*, 792 F.2d 1360, 1362-63 (5th Cir. 1986) (the personnel policies of university police); *Day v. South Park Independent School District*, 768 F.2d 696, 700-

---

[1] Ms. Vanterpool also contends that her failure to answer Mr. James was protected by the First Amendment. To the extent that the her underlying comments were not protected activity, her silence when questioned does not cloak Ms. Vanterpool with First Amendment protection.

01 (5th Cir. 1985), *cert. denied*, 474 U.S. 1101 (1986) (an unfavorable employee evaluation). As a result, these comments do not garner First Amendment protection, and Ms. Vanterpool's claims must be dismissed.

B.  **Ms. Vanterpool's Comments Do Not Outweigh The Government's Interest In Managing The Working Environment.**

Next, Vanterpool contends that her interest in speaking out on matters of public concern outweigh any governmental interest in managing the working environment. In conducting the balancing test under the second prong, courts consider the context in which the speech was made, including the employee's role and the extent to which the speech impairs the efficiency of the workplace. *See Rankin v. McPherson*, 483 U.S. 378, 388-91 (1987). An employee who has a "confidential, policymaking, or public contact role and speaks out in a manner that interferes with or undermines the operation of the agency, its mission, or its public confidence, enjoys substantially less First Amendment protection than does a lower level employee." *McVey v. Stacey*, 157 F.3d 271, 278 (4th Cir. 1998); *Bland v. Roberts*, 2013 U.S. App. LEXIS 19268, at *7 (4th Cir. Sept. 18, 2013).

Clearly, Ms. Vanterpool spoke out "in a manner that interferes with or undermines the operation of the agency, its mission, or its public confidence." Indeed, her comments directly undermined the operation of the Office of the Attorney General, its mission and public confidence by stating that the Attorney General "is NEVER in the AG's office and solely uses the position for self promotion." Moreover, Ms. Vanterpool's comments concerning the OAG's Media policy further denigrate the Office and undermine the public confidence it requires to be effective. On these issues, "a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151-52.

Ms. Vanterpool's subjective belief that her "comments caused no disruption to the office," Compl. ¶ 32, are of no moment. "The Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs." *Connick*, 461 U.S. at 151-52. This discretion includes "the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch." *Id.* The Supreme Court recognized that "[p]rolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency." *Id.* (holding that "it is important to the efficient and successful operation of the District Attorney's office for Assistants to maintain close working relationships with their superiors.").

When comments undermine the operation of an agency, they are not protected by the First Amendment if the employee has a "confidential, policymaking, or public contact role." *McVey*, 157 F.3d at 278. The Court analyzes such claims under the principles established by *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980). *Bland*, 2013 U.S. App. LEXIS 19268, at *10 (citing *Fields v. Prater*, 566 F.3d 381, 385-86 (4th Cir. 2009)). Ms. Vanterpool contends that she does not fall within the *Elrod-Branti* exception because she is a simple "line attorney." As such, she "did not occupy a confidential or policymaking or public contact role in the AG's office." See Plt's Br., 6.

However, Vanterpool's contention is not supported by statute. Indeed, the Virginia Code sets forth the duties of the Attorney General and provides that the Attorney General may appoint any necessary Assistant Attorneys General to carry out the statutory duties of the Attorney General. Virginia Code § 2.2-501. Whenever an AAG is providing advice to a client or performing any of the statutory duties assigned to the Attorney General, she is acting as an agent

4

of the Attorney General.[2] Thus, more so than a sheriff's deputy, AAGs operate as "the alter ego" of the Attorney General. Therefore, they may be lawfully terminated under the *Elrod-Branti* exception. *See Jenkins v. Medford*, 119 F.3d 1156, 1164 (4th Cir. 1997).

Given the nature of the position she held, it cannot reasonably be argued that Ms. Vanterpool did not fit within the *Elrod-Branti* exception. Indeed, even Ms. Vanterpool recognizes that her position resulted from political patronage. For example, Vanterpool concedes that that she was "placed in the position," through her own political patronage, "[a]s a supporter of the previous attorney general, Bob McDonald (sic)." (Doc. 18 at 9). As a result, Ms. Vanterpool had "no constitutional right to continued employment" after her comments, and she has failed to state a claim under 42 U.S.C. § 1983. *See Jenkins v. Medford*, 119 F.3d at 1164; *McVey*, 157 F.3d at 278; *Bland*, 2013 U.S. App. LEXIS 19268, at *7.

C.  **Vanterpool's own pleadings make clear that her violation of office policy and her dishonesty properly subjected her to discipline.**

In her Memorandum, Vanterpool asserts that "[t]here is no support for [Respondents'] theory that Ms. Vanterpool was terminated for violating the media policy or for providing false information." (Doc. 18 at 12). However, her own pleadings make clear that she did violate office policy, she was dishonest, and she was subject to discipline as a result.

Despite having previously told Mr. James that she had nothing to do with the comments at issue and previously having pled that she had no connection to the comments, Ms. Vanterpool makes clear in her Memorandum that the comments were, in fact, hers. (Doc. 18 at 4). With that now established, Ms. Vanterpool's own pleadings demonstrate that she both violated office policy and was dishonest with Mr. James.

---

[2] The derivative nature of the authority held by AAGs explains the need for a media policy. Because all lawyers within the Office are speaking for the Attorney General when they speak, it is necessary for all communication with persons outside of the office come from a central source to make certain that the views expressed are actually the views of the Attorney General.

5

1. **Ms. Vanterpool's own pleadings establish that her comments violate office policy.**

In her Amended Complaint, Ms. Vanterpool pleads both the existence of the Office's Media Policy (Doc. 9 at 5) and the contents of that policy by attaching it as an exhibit to her Amended Complaint. In pertinent part, the Media Policy provides that no employee of the Office should "send any internal communications or documents **or relate the content thereof to individuals outside the office . . . .**" (Doc. 9 at Ex. 4) (emphasis added). On their face, Ms. Vanterpool's comments relate the content of internal Office policy to individuals outside of the Office. Thus, Ms. Vanterpool has now pled that she did, in fact, violate office policy. Accordingly, not only is there support for the proposition that Ms. Vanterpool violated policy, it has been conclusively established.

2. **Ms. Vanterpool's own pleadings establish that she was dishonest with Mr. James.**

Based on her own pleading, it is clear that Ms. Vanterpool was dishonest in her conversations with Mr. James. She has specifically pled that she told Mr. James that she did not post the comments (Doc 9 at Par. 13 & 16). However, she now claims the posting as her own and states that she "authorized the posting of the comments." (*Id*. at Par. 13). Having done so, she has conceded that she was dishonest with Mr. James.

Her attempt to justify her attempt to deceive Mr. James only digs the hole deeper. Her argument is that she did not deceive Mr. James because she had an agent hit "send" for her, and therefore, despite writing and authorizing the comments, she did not post them. (Doc. 18 at 12). It is exactly this type of intentional deception and attempt to deny responsibility that supports discipline for a lack of candor and honesty.[3]

---

[3] Ms. Vanterpool cannot have it both ways. If the comments were hers, her statement to Mr. James that she did not post them is dishonest. If the physical act of hitting send is necessary to make the comments hers, the comments are not hers for First Amendment purposes, and therefore, her claim fails.

In addition to the dishonesty regarding the posting of the comments, it is clear that Ms. Vanterpool was dishonest with both Mr. James and this Court. Despite finally admitting that the comments are hers, that she wrote them and that she authorized the posting of the comments, Ms. Vanterpool told Mr. James and continues to plead that it was error to "conclude[ ] that the handle 'bzbzsammy' was **connected** to" Vanterpool. (Doc. 9 at Par. 16) (emphasis added). Given that it is impossible for her to have made, written, and/or authorized the posting of the comments and to simultaneously have had no "connection" to the handle under which the comments were posted, Ms. Vanterpool has conclusively pled that she was and continues to be dishonest regarding the comments.

>    3.   **Ms. Vanterpool's own pleadings establish that she was disciplined for her failure to comply with office policy and her dishonesty.**

Her failure to comply with office policy and her dishonesty with Mr. James provided more than a sufficient basis for disciplinary action against Ms. Vanterpool. Any doubt that this is so and that she was disciplined for these breaches is belied by her own pleadings.

In addition to pleading the existence and content of the media policy, Ms. Vanterpool pled the existence and content of the Office's "Conduct of Staff" policy. (Doc. 9 at Ex. 4). Said policy makes it clear that an employee is subject to discipline for among other things: (1) failure to comply with any "policy, procedure and/or protocol" of the Office, (2) "[v]iolations of ethical standards," (3) "[d]isclosure of information regarding Office work to any person outside the office who are not directly involved in the matter," and (4) "refusal to comply with the instructions of a supervisor in a job-related matter."[4] (*Id.*). Furthermore, she expressly pled that

---

[4] Exhibit 5 to Ms. Vanterpool's Amended Complaint purports to be the "Conduct of Staff" policy. However, a cursory review reveals that she has only attached the first page and the third page, omitting the second page. The second page, which is attached to her original Complaint (Doc. 1, Ex. 3), provides that employees also are subject to discipline for acts of "dishonesty . . . ." This, of course, was one of the reasons Mr. James gave for disciplining Ms. Vanterpool. (Doc. 9 at Par. 17-18 & Ex. 4).

7

she was notified she was being disciplined for the failure to comply with office policy, including the Conduct of Staff policy. (Doc. 9 at Par. 17-18 & Ex. 3).

Thus, based on Ms. Vanterpool's own pleadings, it has been established that she violated numerous office policies, that she was subject to discipline as a result, and that she was told she was being disciplined for those violations. Accordingly, she cannot establish that "but for" her allegedly protected speech that she would not have been subject to discipline, and therefore, her claim fails. *Huang v. Board of Governors of University of North Carolina*, 902 F.2d 1134, 1140 (4th Cir. 1990).

Her attempt to salvage her situation by citing to *Wagner v. Wheeler*, 13 F.3d 86 (4th Cir. 1993), is unavailing. The *Wagner* court upheld an employee's dismissal because he could not offer evidence to support a claim that the stated reasons for his termination were merely pretextual. *Id*. at 90-91. Here, plaintiff's own pleadings demonstrate that she violated office policy, was dishonest with Mr. James, and that those were the reasons given for the discipline. Thus, her own pleading makes clear that the reasons given were not pretextual, but were correct as a matter of fact.

 D. **Plaintiff's Claims Against the Respondents In Their Individual Capacity Are Barred By Qualified Immunity.**

"A government official who is sued in his individual capacity may invoke qualified immunity." *Bland*, 2013 U.S. App. LEXIS 19268, at *60. Qualified immunity protects government officials from civil damages in a *§ 1983* action "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (internal quotation marks omitted); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has held that "[q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Hope v. Pelzer,* 536 U.S. 730, 752 (2002)

8

(quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Johnson v. Caudill,* 475 F.3d 645, 651 (4th Cir. 2007).

"In determining whether a defendant is entitled to qualified immunity, a court must decide (1) whether the defendant has violated a constitutional right of the plaintiff and (2) whether that right was clearly established at the time of the alleged misconduct." *Bland*, 2013 U.S. App. LEXIS 19268, at *60.  "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope,* 536 U.S. at 739.  Given the "difficult-to-apply" balancing test that is involved with First Amendment claims, the Fourth Circuit has recognized that courts can rarely say that the law was so clearly established that reasonable officials would have known that an employee's activity was constitutionally protected. *Pike v. Osborne*, 301 F.3d 182, 185 (4th Cir. 2002); *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995).

Respondents contend that the content, form and context of these statements show that they were not addressing a matter of public concern.  Rather, they were addressing the internal affairs of the office.  To the extent this Court disagrees, it still cannot be shown that Respondents violated a clearly established constitutional or statutory right.  Indeed, the necessity of applying the *Pickering* balancing test necessarily suggests that the application of First Amendment protections for these comments is not clearly defined.  These comments are insufficient, as a matter of law, to sustain a claim against government officials acting in their official capacities.

Assuming, *arguendo*, that Ms. Vanterpool has stated a First Amendment claim for either speech or political affiliation, Respondents remain entitled to qualified immunity because that

right is not clearly established as it pertains to Assistant Attorneys General, who are appointed directly by the Attorney General, a constitutionally elected official. Va. Code § 2.2-501.

The Fourth Circuit recently had an opportunity to review the qualified immunity defense in *Bland*. In that case, the Fourth Circuit concluded that *Jenkins* is best read as analyzing the duties of the particular deputies; rather than the duties of a particular position. *See Bland*, 2013 U.S. App. LEXIS 19268, at *61-2. However, the Fourth Circuit determined that this issue was far from clear in *Jenkins*, and the subsequent cases. The Court noted that even the dissent in *Jenkins* interpreted the Court's ruling to not require an analysis of a particular individual's job duties. *Id.* (citing *Jenkins,* 119 F.3d at 1166 (Motz, J., dissenting) ("The majority . . . engages in no analysis of the particular duties of each deputy."); id. ("[T]he majority . . . finds that all North Carolina deputy sheriffs are policymakers -- without ever considering the positions held by each of the deputies at issue or their specific job duties."). As such, the Fourth Circuit explicitly recognized that a broader reading of *Jenkins* was in line with its decisions in *Knight v. Vernon*, 213 F. 3d 544 (4th Cir. 2000) and *Pike v. Osborne*, 301 F.3d 182 (4th Cir. 2002). *See Bland*, 2013 U.S. App. LEXIS 19268, at *64-5. The Court specifically noted that it had sent "mixed signals." *Id.* at *67. Although *Bland* took the opportunity to clarify *Jenkins,* the Court correctly noted that for qualified immunity the relevant inquiry is what a reasonable person would have known on the date of discharge. *Id.*, at *70-1, n.22. As a result, the Fourth Circuit held that the defendants were entitled to qualified immunity. *Id.*

Likewise, the respondents are entitled to qualified immunity. At the time of Plaintiff's discharge, the respondents could reasonably interpret *Jenkins* to support their conclusions that all Assistant Attorneys General fall within the *Elrod-Branti* exception. Indeed, the respondents were faced with interpreting the Fourth Circuit's decision in *Jenkins* which the Fourth Circuit has

since concluded sent "mixed signals." As such, this Court cannot reasonably conclude that the respondents are liable for transgressing a bright line. Because qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quotation omitted). Therefore, each of the individual Respondents should be dismissed.

### E. Plaintiff has failed to allege sufficient facts to impose liability on Mr. Cuccinelli.

As a general matter, *respondeat superior* liability is not cognizable in a § 1983 claim. *Bowers v. Rector & Visitors of the Univ. of Va.*, 478 F. Supp. 2d 874, 882 (W.D. Va. 2007) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Rizzo v. Goode*, 423 U.S. 362, 377 (1975)). Yet, given the paucity of allegations in the Amended Complaint regarding Mr. Cuccinelli, that is exactly the basis for which Ms. Vanterpool seeks to hold Mr. Cuccinelli liable. This attempt fails as a matter of law.

Faced with the general rule, Ms. Vanterpool cites to *Carter v. Morris*, 164 F.3d 215, 221 (4th Cir. 1999) to argue that supervisory liability may be appropriate if the supervisor is deliberately indifferent to constitutional violations that may be occurring as a result of the actions of a subordinate. (Doc. 18 at 16). However, a review of *Carter* and the decision upon which it relies demonstrates the futility of Ms. Vanterpool's efforts in this regard.

Like municipal liability, supervisory liability can only be imposed if there is a pervasive pattern and practice that amounts to a general policy condoning constitutional deprivations. As the Fourth Circuit has noted, to establish the first element of supervisory liability

> a plaintiff must show the following: (1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff. **Establishing a "pervasive" and "unreasonable" risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions** and that the conduct engaged in by the subordinate poses an

11

> unreasonable risk of harm of constitutional injury. . . . A plaintiff may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of **documented widespread abuses**.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal citations and quotation marks omitted) (emphasis added). Here, Ms. Vanterpool does not and cannot allege that there was a widespread or consistent pattern regarding this factual scenario. Given the absence of such a pattern, supervisory liability cannot be imposed on Mr. Cuccinelli. Accordingly, the claims against him must be dismissed.

### F. Section 1983 Does Not Create An Independent Cause Of Action For Constructive Discharge

Section 1983 does not create a separate cause of action for "constructive discharge." Rather, Section 1983 incorporates the concept of constructive discharge as one of the necessary elements to prove in a claim for deprivation of First Amendment rights. "First, to trigger First Amendment protection, the speech at issue must relate to matters of public interest." *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 351-352 (4th Cir. 2000). Second, the "employee's interest in First Amendment expression must outweigh the employer's interest in efficient operation of the workplace." *Id.* "Third, the employee must establish retaliation of some kind -- that he was deprived of a valuable government benefit or adversely affected in a manner that, at the very least, would tend to chill his exercise of First Amendment rights." *Id.* "Finally, the employee must establish a causal relationship between the protected expression and the retaliation: that the protected speech was a substantial factor in the decision to take the allegedly retaliatory action." *Id.* It is the retaliation prong of this test where Vanterpool would be required

to show that she was, in fact, constructively discharged. Therefore, Vanterpool's separate cause of action should be dismissed.[5]

**G.  Plaintiff's blanket request for leave to amend should be ignored.**

While it is true that leave to amend is liberally granted, Vanterpool's blanket request for leave to make an unspecified amendment in the future, (Doc. 18 at 18), should be ignored. After all, even though leave is liberally granted, a plaintiff must first actually move for leave to amend in a manner that allows the court to determine that the amendment is not prejudicial, futile, or offered in bad faith. *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986). Given that Vanterpool has not specified any proposed amendments, it is impossible to properly evaluate the blanket request, and therefore, the court should ignore the request at this time.

## IV.    CONCLUSION

Respondents respectfully request that this Motion to Dismiss be granted, that Plaintiff's Complaint be dismissed with prejudice, that the Respondents be awarded their costs incurred herein, and that such other relief be granted as the Court deems just and appropriate.

Respectfully Submitted,
**KENNETH T. CUCCINELLI, II,**
and
**CHARLES E. JAMES, JR.,**

By:  _____/s/_____
G. William Norris, Jr.
Virginia Bar Number: 41754
Counsel for Defendants
Office of the Attorney General
900 East Main Street
Richmond, Virginia  23219
Telephone: (804) 371-0817
Fax: (804) 371-2087
E-mail:  *gnorris@oag.state.va.us*

---

[5] Importantly, the Respondents' Motion to Dismiss does not rely on whether Vanterpool resigned her employment or was constructively discharged. Indeed, the Court does not need to reach this conclusion to grant the Motion to Dismiss.

Wesley G. Russell, Jr.
Deputy Attorney General

**G. William Norris, Jr.\***
Assistant Attorney General
Virginia Bar No. 41754
Office of the Attorney General
900 East Main Street
Richmond, Virginia  23219
Phone: (804) 371-0817
Fax: (804) 371-2087
Email: gnorris@oag.state.va.us
**\*Counsel of Record for Defendants**

## CERTIFICATE OF SERVICE

I hereby certify that, on this 7th day of November, 2013, the foregoing **REBUTTAL BRIEF IN SUPPORT OF RESPONDENTS' MOTION TO DISMISS** was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing (NEF) to the following:

Richard E. Patrick, Esq.
JORDAN, PATRICK & COOLEY, LLP
10560 Main Street
Suite 310
Fairfax, Virginia 22030
rpatrick@jpcattorneys.com

By: _____/s/_____
G. William Norris, Jr.
Virginia Bar Number: 41754
Counsel for Defendants
Office of the Attorney General
900 East Main Street
Richmond, Virginia  23219
Telephone: (804) 371-0817
Fax: (804) 371-2087
E-mail:  *gnorris@oag.state.va.us*